IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PATRICE CAMPBELL<br>c/o 1025 Connecticut Ave. NW<br>Suite 615<br>Washington, D.C. 20008<br>        Plaintiff<br>    v.<br><br>THE OFFICE OF BRAD<br>SCHNEIDER, U.S. HOUSE OF<br>REPRESENTATIVES, ILLINOIS,<br>10TH DISTRICT,<br><br>        Defendant. | Civil Action No.<br><br>JURY DEMAND INCLUDED |

# COMPLAINT

Plaintiff, Patrice Campbell, by and through her undersigned counsel, hereby submits her Complaint against Defendant, The Office of Representative Brad Schneider (U.S. House of Representatives, Illinois, 10th District). The following statements are made upon information and belief, and claims in this complaint may be stated in the alternative.

In summary, Karyn Davidman – Plaintiff's supervisor and the Representative's Casework and Veterans Affairs Director – created an intolerable hostile work environment aimed at the Plaintiff because Plaintiff is Black. On one occasion, Director Davidman was relaying a story to Plaintiff regarding lanyards to secure face masks used to guard against COVID-19 infection. During that discussion, Davidman told Plaintiff, the Office's only Black employee, "You are going to have to get a rope and put it around your neck." Taken aback by Davidman's obvious reference to lynching, Plaintiff explained to Davidman that her instruction was inappropriate and inflammatory and that she cannot say things like that. Plaintiff further explained to Davidman that the "rope" to which she referred is called a lanyard. The very next day, on a Microsoft Teams

1

video conference attended by the Representative's entire staff (excluding the Representative himself), Davidman forcefully instructed the Plaintiff: "put your face on camera please … Really - face on I have a reason[.]" After ensuring that Plaintiff's face was visible on the video conference so that Davidman and the entire staff could witness Plaintiff's reaction, Davidman proceeded to repeat the same story she told Plaintiff the day before and to share how she had instructed Plaintiff that she would be required to "put a rope around her neck." Davidman laughed hysterically throughout her story. Fully aware that she was targeting Plaintiff and making light of a horrific reality, Davidman even mentioned that her husband had warned her that her statement to Plaintiff was totally inappropriate. After the Microsoft Teams video conference ended, Davidman called Plaintiff to further mock her – laughing and declaring, "You should have seen your face when I told that story!"

Davidman's conduct created a hostile work environment, targeted at Ms. Campbell because of her race and color, in violation of the Congressional Accountability Act. Defendant failed to take responsible and reasonable action against Davidman, who was not disciplined and who remains Plaintiff's supervisor. Instead, the Defendant has since engaged in retaliatory conduct against Plaintiff.

## I. JURISDICTION

1. Plaintiff invokes the jurisdiction of this Court pursuant to the Congressional Accountability Act of 1995 (2 U.S.C. §1408 (a)), 28 U.S.C. § 1331 (Federal Question), and 28 U.S.C. § 1343).

2. This is an action authorized and instituted pursuant to the Congressional Accountability Act (2 U.S.C. § 1301 et seq.).

3. The unlawful employment practices alleged in this Complaint were committed in the

District of Columbia.

4. Plaintiff is an employee of the House of Representatives, and, therefore, she is a "covered employee" pursuant to the Congressional Accountability Act (2 U.S.C. § 1301(a)(3)(A)).

5. Plaintiff resides in Zion, Illinois. At all times relevant to this Complaint, Plaintiff has been, and continues to be, employed by the Office of Congressman Brad Schneider as a Constituent Services Representative in the Lincolnshire District Office.

6. The Defendant Office of Congressman Brad Schneider is an "Employing Office" of the United States House of Representatives, pursuant to the Congressional Accountability Act (2 U.S.C. § 1301(a)(9)(A)).

7. The Congressional Accountability Act mandates that "[a]ll personnel actions affecting covered employees shall be made free from any discrimination based on race [or], color [,]" in compliance with Title VII of the Civil Rights Act of 1964. 2 U.S.C. § 1311(a)(1).

8. The Congressional Accountability Act makes it unlawful for an employing office, such as the Defendant, to "intimidate, take reprisal against, or otherwise discriminate against, any covered employee because the covered employee has opposed any practice made unlawful by [the Act]." 2 U.S.C. § 1317(a).

9. Plaintiff has satisfied all administrative and judicial prerequisites to the institution of this action. On July 14, 2021, the Plaintiff filed a claim with the Office of Congressional Workplace Rights (OCWR) raising the violations of the Congressional Accountability Act complained of here. The OCWR Complaint was filed within 180 days from the date(s) of Defendant's violations of Plaintiff's rights, as required by 2 U.S.C. § 1402(d). Plaintiff has the right to file this civil action, pursuant to 2 U.S.C. §§ 1401 and 1408 because she has not submitted a request for a hearing at the Office of Congressional Workplace Rights with respect to this claim

(2 U.S.C. § 1401(b)(1)), and this civil action is filed within 70 days of the date Plaintiff filed her OCWR claim, as required by 2 U.S.C. § 1401(d).

## II.  PERTINENT FACTS

10. At all times relevant to this Complaint, Members and employees of the U.S. House of Representatives ("House"), including Defendant, were educated about the requirements and prohibitions of the Congressional Accountability Act through Workplace Rights and Responsibilities Training and resources available through the Office of Congressional Workplace Rights.

11. Plaintiff is employed with the Office of Representative Brad Schneider (the "Office") as a Constituent Services Representative on the Constituent Services Team.  Plaintiff's direct supervisor is Casework and Veterans Affairs Director, Karyn Davidman.

12. As a Constituent Services Representative, also known as a "Caseworker," Plaintiff has responsibility for, among other things, assisting residents within Representative Schneider's District (i.e., constituents) who reach out to the Office for help navigating their rights or claims before federal agencies (i.e., a "case").

13. Director Davidman oversees the Constituent Services Team and determines whether, and to what degree, the Office will assist a constituent seeking help from the Office.

14. In her role as Casework and Veterans Affairs Director, Davidman has displayed a pattern of bias towards individuals of color in and outside of the Office, with a particularly discriminatory attitude towards African Americans. Specifically, Davidman's discriminatory attitude is demonstrated by, *inter alia*, her refusing to assist African American constituents, consistent favoritism of her Caucasian subordinate employee, and most pointedly, by the egregious conduct to which she subjected Plaintiff on March 3 and 4, 2021.

15. Throughout Plaintiff's employment with the Office, Director Davidman has accepted very few requests for assistance from majority black and brown communities (e.g., Zion, North Chicago and Waukegan, Illinois) within Representative Schneider's District.

16. On information and belief, of the few cases that Director Davidman has opened on behalf of African American constituents, all have been assigned to Plaintiff.  These assignments have made Plaintiff feel like the "Black people representative" for the Office, which singles Plaintiff out because of her race or color and demonstrates a biased attitude toward Black constituents.

17. In the approximate year and a half that Plaintiff has worked as a Constituent Services Representative, she has only helped nine Black constituents, which is an indication of the small number of requests that Davidman accepts from Black constituents.

18. Director Davidman's discriminatory acceptance of constituent requests for assistance has also been noticed by individuals outside of the Office.  Notably, a Black local elected official shared with Plaintiff concerns that Davidman displayed racial bias in the processing, or lack thereof, of the official's request for assistance. Subsequently, when the local official contacted the Office for a second time, Plaintiff had to advocate for the Office to open a case and assist the local official.

19. Davidman also frequently complains about an African American female Post Office Operations Manager ("POOM") and refuses to work with her, stating, "I don't even deal with [her]. I don't understand why she's a supervisor."  Instead, Davidman only works with the Caucasian POOM and readily announces that she will only work with him.

20. Davidman frequently makes off-hand comments that are, at best, racially insensitive, if not outright discriminatory. For example, on one occasion after a coworker of Latin American

5

descent finished speaking during an Office meeting, Davidman spontaneously noted that she was reminded of her housekeeper and began discussing her housekeeper. Plaintiff did not observe any connection between her colleague's statements and Davidman's housekeeper.

21. With regard to her role as a supervisor, Director Davidman consistently favors her Caucasian subordinate employee over her two other subordinate employees – an employee of Latin descent and Plaintiff – with respect to the allocation of their respective workloads. While Davidman is proactive in ensuring that a Caucasian subordinate is not overwhelmed or overworked, she does not display the same awareness with respect to Plaintiff and her colleague. Instead, Davidman routinely assigns new matters to Plaintiff without respect to Plaintiff's workload or capacity and frequently insists that Plaintiff is not that busy.

22. On or about March 3, 2021, Director Davidman escalated her discriminatory conduct towards Plaintiff.

23. On that day, Director Davidman had a telephone conversation with Plaintiff, in which Davidman accused Plaintiff of having told a constituent that she could not help her with slow postal service. Plaintiff asked Davidman why she believed that Plaintiff had been the staffer involved, Davidman responded that the constituent had claimed that the staffer was Black.

24. Plaintiff explained that she had not told the constituent that she could not help her, and that instead she had shared with the constituent several steps that could be taken, such as having the Congressional Office reach out to the Post Office Operations Manager to make an inquiry, or that the constituent could sign up for "informed delivery" service from the Post Office.

25. Director Davidman appeared not to believe Plaintiff, and he instructed Plaintiff to provide all constituents with her work-issued mobile telephone number moving forward. When Plaintiff explained that she does provide her mobile number to constituents, Davidman falsely

6

claimed, "No you don't – I've heard you give the main number out." Plaintiff was confused by Davidman's assertions because Plaintiff regularly shared her mobile number with constituents. Moreover, Plaintiff consistently worked from home at the time in question and, therefore, Davidman did not have the opportunity to hear which number Plaintiff generally shared with constituents.

26. Shortly after this exchange ended, Davidman and Plaintiff spoke again on the phone. Davidman – who still seemed upset with Plaintiff – recounted a story about a constituent who wanted to provide the Congressman's staff with lanyards, which Davidman apparently believed resembled "ropes," to secure their COVID-19 face masks.

27. Davidman proclaimed to Plaintiff: "Patrice – you are going to have to get a rope and put it around your neck!"

28. This comment from Plaintiff's direct supervisor was shocking, intimidating, and hurtful to Plaintiff because it was a clear reference to lynching, when Black people were hanged and killed with ropes in homemade nooses by white mobs who terrorized largely helpless and unprotected Black communities with what the aggressors considered mob justice to keep the Black community subservient and cowed.

29. Plaintiff told Davidman that – on this one occasion – she would forgive the comment, but she cautioned Davidman never to say anything like that again.

30. Plaintiff was not alone in finding the comment hurtful and inappropriate. Plaintiff could hear Davidman's husband in the background exclaiming: "What did you just say … you can't say that!" after he heard Ms. Davidman's comment to Plaintiff.

31. The very next day, Plaintiff participated in a Microsoft Teams video conference scheduled and initiated by Representative Schneider's staff in the District of Columbia.

7

32. This was a daily Microsoft Teams meeting, hosted by the Chief of Staff, Casey O'Shea, from the Washington, D.C. Office, and attended by Representative Schneider's entire staff, including both the Lincolnshire and Washington, D.C. Staff (but excluding the Representative himself).

33. Near the end of the meeting, Davidman sent an email to Plaintiff that instructed Plaintiff to "put your face on camera please."

34. Plaintiff responded that she was on the camera, to which Davidman responded "Really – face on I have a reason".

35. The reason that Davidman had in mind was to create the maximum intimidating effect and cause the maximum possible pain and humiliation to Plaintiff, who is the only Black employee on Representative Schneider's entire staff.

36. Shortly after Davidman instructed Plaintiff to "put [her] face on camera," the Microsoft Teams meeting turned to a daily segment during which a designated staffer shares a personal story about themselves with the rest of the staff. That day it was staffer, Vic Goetz's day to present, but Davidman declared: "I switched with Vic."

37. After ensuring that Plaintiff's face could be seen on the video conference feed, Davidman retold her story about the constituent who wanted to provide lanyards to the Office and enthusiastically repeated to the entire staff that she had instructed Plaintiff that she would have to "get a rope and put it around [her] neck."

38. Davidman laughed throughout her story as if her mockery of lynching, and command to Plaintiff that she put a rope around her neck was hysterical. Davidman even acknowledged that her husband had warned her that her statement to Plaintiff was totally inappropriate.

39. Immediately after the call, Davidman made matters worse by calling Plaintiff directly

8

and mocking her – laughing and declaring, "You should have seen your face when I told that story!" Plaintiff responded that Davidman's conduct was unacceptable, and she reminded Davidman that she had already warned her about how inappropriate her comment was. Davidman's immediate response was to end the conversation abruptly, saying "Ok, whatever, I'll talk to you later. Bye."

40. Davidman called Plaintiff back a short time later and asked if Plaintiff was offended. Davidman conveyed to Plaintiff that the Office's District Director, Greg Claus, had called Davidman to tell her that she had made a mockery of lynching. Plaintiff informed Davidman that, indeed she was hurt and offended because Davidman had repeated her offensive comments. Davidman responded "It looks like a rope to me, so I am going to call it a rope. You all can call it what you want." Davidman then abruptly ended the call and hung up the phone.

41. Shortly after Plaintiff's call with Davidman, District Director Claus called Plaintiff to ask how she was. Claus told Plaintiff that he had cautioned Davidman, and stated something to the effect of, "How dare she make fun of such an atrocious part of our history?" In response, Plaintiff told Claus that she had warned Davidman about her inappropriate comment the day before. Claus responded that, while Davidman's conduct on March 3 could be chalked up to an innocent mistake, her conduct during the Teams meeting on March 4 was totally unacceptable.

42. During a Teams communication the following day, March 5, 2021, Plaintiff informed District Director Claus that there was another aspect of the story he was not yet aware of. Plaintiff then forward Davidman's emails in which Davidman instructed Plaintiff to "put [her] face on camera," right before she repeated her story about lynching.

43. In a subsequent call on March 5, 2021, District Director Claus and Chief of Staff Casey O'Shea promised Plaintiff that they would take appropriate action.

44. Davidman was not disciplined for her conduct.  Instead, on information and belief, she was given a week off, using paid administrative leave.

45. On March 8, 2021, Plaintiff spoke to District Director Claus and Chief of Staff O'Shea (who was in Washington, D.C.), to ask what, if any, corrective actions the office planned to take in response to Davidman's hostile discriminatory conduct.  O'Shea and Claus told Plaintiff that Davidman would no longer supervise Plaintiff and explained the steps they were going to take to limit Plaintiff's interaction with Davidman.  Rather than taking away Davidman's duties, the Office planned to confine Plaintiff's caseload to postal service and tax issues to reduce her interaction with Davidman.

46. Plaintiff objected to having her caseload limited and reduced because it had the effect of punishing her, rather than the wrongdoer, for having complained.  Plaintiff made clear that limiting her caseload would pigeon-hole her and inhibit her chances of advancing in the Office.

47. Plaintiff let Chief of Staff O'Shea and District Director Claus know that she was hurt and that she did not want the incident to adversely affect her work.  In response, O'Shea turned the tables on Plaintiff and ordered her to "pivot and get back to work."

48. On March 13, 2021, after reflecting on Davidman's cruel, purposeful, and targeted behavior on March 3 and 4, Plaintiff emailed Chief of Staff O'Shea and District Director Claus to share additional concerns about Davidman's treatment of people of color both in and outside of the Office.  Specifically, Plaintiff shared with her managers other instances of Davidman's racially-insensitive and biased treatment of her as well as her colleagues and constituents of color, including but not limited to, Davidman's disparate treatment of subordinate employees of color, complaints from a local commissioner who believes that Davidman is racist, and Davidman's consistent refusal to open cases on behalf of Black constituents who request the Office's assistance

(all of which are discussed above).

49. Although O'Shea and Claus indicated that they would investigate these broader complaints and inform Plaintiff of the outcome, to date, no "investigation" has been completed and to Plaintiff's knowledge, no action has been taken against Davidman.

50. As a result of Davidman's discriminatory conduct and the Defendant's failure to address the hostile work environment, Plaintiff disintegrated emotionally.

51. The discriminatory hostile conduct and the Office's failure to take appropriate action to prevent further discrimination, left Plaintiff so emotionally traumatized that she was forced to take FMLA leave for the month of April 2021 and to work a reduced schedule, using FMLA leave, for the months of May and June 2021.

52. Although communicated through District Director Claus, it is Davidman who assigns Plaintiff's work and decides which constituent calls Plaintiff will handle. Davidman also communicates to Plaintiff through District Director Claus.

53. Since Plaintiff complained about Davidman's conduct, Plaintiff's duties have changed significantly. Whereas prior to her complaint, Plaintiff handled a large variety of constituent requests, covering a broad array of topics, after she complained, the Office assigned only tax inquiries (with few possible exceptions) to Plaintiff.

54. Consequently, Plaintiff is required to work on the most onerous cases, because the constituents are upset because of action or inaction on the part of the IRS, the cases involve the risk of severe negative consequences for the constituents, and the cases take a long time to resolve.

55. As a result, working the tax cases has largely made Plaintiff the subject of the constituents' ire, and she regularly receives calls from frustrated and upset constituents.

56. On or about May 3, 2021, Defendant removed Plaintiff's authority to post to

Representative Schneider's Facebook account, which had been part of her responsibilities prior to complaining about Davidman's conduct.

57. Additionally, despite her reduced working hours, Davidman assigns Plaintiff more work than Plaintiff can reasonably be expected to perform, including her (restricted) casework as well as military academy issues, the Congressional Art competition, recommendation letters for constituents and IRS Child Tax Credit briefings and meetings, which causes Plaintiff anxiety and stress, and has placed her in fear of losing her employment with the Office.

58. Further, on or about June 30, 2021, District Director Claus posted information about Plaintiff's FMLA reduced work schedule to the entire staff, whereas other staff's leave does not get disseminated to the entire staff. This was humiliating to Plaintiff and singled her out among all the staff.

### III. COUNT I – HOSTILE WORK ENVIRONMENT BASED ON RACE AND/OR COLOR

59. Plaintiff restates and incorporates by reference each of the above paragraphs as if it were specifically repeated here.

60. The hostile conduct, described in paragraphs 10-58, above, was directed at Plaintiff because of her race and/or color, because she is Black, in violation of the Congressional Accountability Act's mandate that all personnel actions affecting covered employees shall be made free from any discrimination based on race or color, in compliance with Title VII of the Civil Rights Act of 1964.

61. At all times relevant to this civil action, Davidman's conduct was sufficiently severe or pervasive to negatively alter the terms and conditions of Plaintiff's employment such that it violated the Congressional Accountability Act. Specifically, viewed both objectively and subjectively, Davidman's conduct was so severe or pervasive that it adversely affected the terms

12

and conditions of Plaintiff's employment.

62. Defendant was aware of the hostile conduct, but it failed to take appropriate corrective action to protect Plaintiff or to promptly put an end to the hostile work environment.

63. Even worse, after Plaintiff complained about the hostile work environment, Defendant aggravated the hostile work environment by, among other things, maintaining Davidman's role as Plaintiff's supervisor, narrowing the scope of Plaintiff's work, and limiting Plaintiff to primarily working on onerous tax inquiries.

64. As a result of the discriminatory hostile working environment, Defendant violated the Congressional Accountability Act and caused Plaintiff to experience significant emotional pain and suffering, including depression and anxiety.

## IV. COUNT II – RETALIATION

65. Plaintiff restates each of the foregoing paragraphs as if they were restated here.

66. Plaintiff engaged in protected activity by (1) telling her Supervisor, Karyn Davidman, that her "rope around your neck" comment was inappropriate on both March 3 and 4, 2021; (2) complaining about Davidman's discriminatory conduct to District Director Claus on March 4, 2021; (3) complaining about Davidman's discriminatory conduct to Chief of Staff O'Shea on March 8, 2021; (4) complaining about Davidman's broader discriminatory conduct towards Plaintiff and other people of color, including colleagues and constituents, to Chief of Staff O'Shea and District Director Claus on March 13, 2021; and (5) subsequently questioning the adequacy of the Office's actions to correct the discriminatory conduct and protect Plaintiff against future discrimination or retaliation.

67. In retaliation for her protected activity, among other things described in the Fact section above, Defendant narrowed the scope of Plaintiff's duties, assigned her only to onerous constituent

tax issues, and assigned her more work that she could possibly be expected to accomplish on her reduced work schedule.

68. Defendant's conduct violated Section 207 of the Congressional Accountability Act, 2 U.S.C. § 1317(a), which prohibits employers from "intimidat[ing], tak[ing] reprisal against, or otherwise discriminat[ing] against, any covered employee because the covered employee has opposed any practice made unlawful by [the Act]."

69. Defendant's retaliatory conduct toward Plaintiff was "materially adverse" to Plaintiff, meaning that it was reasonably likely to have dissuaded a reasonable worker from making or supporting a charge of discrimination.

70. As a result of the retaliation, Defendant violated the Congressional Accountability Act and caused Plaintiff to experience significant emotional pain and suffering, including depression and anxiety.

WHEREFORE, Plaintiff prays that this Court: (i) declare that the employment practices complained of in this Complaint are unlawful in that they violate the Congressional Accountability Act; (ii) permanently enjoin the Defendant and its agents, officers and employees from engaging in all practices found by this Court to be in violation of the Congressional Accountability Act; (iii) order the Defendant to make the Plaintiff whole by paying Plaintiff any monetary damages, and any out of pocket expenses, proved at trial; (iv) order the Defendant to make the Plaintiff whole by paying Plaintiff pain and suffering compensatory damages for the Plaintiff's emotional pain and suffering in an amount to be determined at trial; (v) retain jurisdiction over this action to ensure full compliance with the Court's orders and require the Defendant to file such reports as the Court deems necessary to evaluate such compliance; (vi) order the Defendant to pay Plaintiff's costs and expenses and reasonable attorneys' fees in connection with this action; and (vii) grant such other

and further relief to the Plaintiffs as the Court deems just and proper.

**PLAINTIFF DEMANDS A TRIAL BY JURY**

        Respectfully Submitted,
        ALDERMAN, DEVORSETZ & HORA, PLLC

        */s/ Leslie D. Alderman III*

        Leslie D. Alderman III (D.C. # 477750)
        1025 Connecticut Ave., NW
        Suite 615
        Washington, DC 20036
        Tel: 202-969-8220
        lalderman@adhlawfirm.com

        Attorney for Plaintiff, Patrice Campbell